IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 12, 2026 Session

## STATE OF TENNESSEE v. JOSEPH EUGENE CHESTNUT, JR.

**Appeal from the Criminal Court for Macon County**
**No. 2021-CR-88     Brody N. Kane, Judge**

_____

### No. M2025-00747-CCA-R3-CD

_____

The Defendant, Joseph Eugene Chestnut, Jr., was convicted by a Macon County jury of one count of first degree premeditated murder and four counts of aggravated cruelty to animals. The trial court imposed an effective sentence of life imprisonment. On appeal, the Defendant claims that the trial court erred by denying his motion to suppress the firearm seized during the warrantless search of his vehicle and that the evidence of premeditation is insufficient to support his conviction of first degree murder. Following our review and pursuant to Tennessee Rule of Criminal Procedure 36, we remand for entry of a corrected judgment in Count One to correct a clerical error. Otherwise, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed;**
**Case Remanded for Entry of Corrected Judgment**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

William W. Gill, Assistant Public Defender – Appellate Division (on appeal); Shelley Thompson Gardner, District Public Defender; and Chris W. Dotson and Joe L. McClerran, Assistant District Public Defenders (at trial), for the appellant, Joseph Eugene Chestnut, Jr.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jason L. Lawson, District Attorney General; and William A. Calla, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

On August 19, 2021, a Macon County grand jury returned a five-count indictment charging the Defendant with one count of first degree murder and four counts of aggravated cruelty to animals, related to the deaths of his wife, Tracy Chestnut, and of her four dogs. On March 24, 2023, the Defendant filed a pretrial motion to suppress the firearm seized during a warrantless search of his vehicle. The trial court held a suppression hearing on May 1, 2023.

A. MOTION TO SUPPRESS

At the suppression hearing, Lilian Marshall testified that she was currently a retired United States Border Patrol (USBP) Agent who had been assigned to the Interstate 10 (I-10) checkpoints in Las Cruces, New Mexico, on August 11, 2021. Agent Marshall testified that in addition to her regular duties as a border patrol agent, she also had collateral duties as an emergency medical technician when needed. She stated that on August 11, 2021, the USBP received a "be on the lookout" (BOLO) report which included a description and a license plate number for a specific vehicle. Agent Marshall recalled that, on that date, she noticed a "commotion" at a vehicle checkpoint near the semitrailers checkpoint at which she was working. She proceeded to the vehicle checkpoint and found that a vehicle had been stopped. After learning that the Defendant had been removed from his vehicle by USBP agents, Agent Marshall went to meet the Defendant in a detention room. She entered the room, wearing her USBA uniform, identified herself as an EMT, and asked the Defendant if he needed medical assistance. The Defendant replied that he was not injured.

Agent Marshall testified that she then followed protocol and asked the Defendant a series of questions to determine whether he had any medical issues the agents needed to be aware of. She testified that the Defendant informed her that he was diabetic, so she then asked, "if he took medication, when was the last time he ate, [and] when was the last time he took his medication." Agent Marshall described the Defendant as cooperative and calm. The Defendant informed Agent Marshall that he took medication for his diabetes, that the medication was stored in his vehicle, that he had not taken his medication "in a little bit," and that "he needed it." Agent Marshall testified that, when she asked the Defendant if he wanted her to get his medication, he described "where it was located" and that it was in a "cooler-type" container. She told the Defendant she would go get his medication for him, and the Defendant did not object. Agent Marshall testified that she believed the Defendant understood she was asking the questions so she could obtain the medication for him, and that he responded by telling her where to find it.

Agent Marshall testified she then went to the Defendant's vehicle, which had been moved to the secondary area of the vehicle checkpoint, to retrieve the medication. She recalled that the vehicle's doors were closed. She was unsure whether she checked the

front or the back of the vehicle first, but she averred that she checked where the Defendant told her the medication was stored. She testified that she opened one of the passenger-side doors and "grabbed the first bag that looked like what he had described." However, when she opened the bag, the medication was not inside. She stated that she then "looked for a bag similar to what he had described" in another part of the vehicle. She testified that she found "a second bag similar to what he had described." When Agent Marshall opened the bag, she saw a firearm, so she "stepped back" to allow a supervisor or other agent to collect the gun from the vehicle. After the gun was collected, Agent Marshall looked in the bag again and located the Defendant's medication, which she retrieved and brought inside the checkpoint to be available "in case of an emergency." She stated that she advised her supervisor that the Defendant needed the medication. She stated that the Defendant would then be able to advise an agent when he needed the medication and they could give it to him upon approval. She explained that they did not just give the medication to the detainee to keep because they did not "want them overdosing or . . . tak[ing] extra." She stated this procedure was to ensure that a detainee did not "hurt themselves." She testified that this ended her interactions with the Defendant because she did nothing further after finding the medication and giving it to a supervisor.

Tennessee Bureau of Investigation (TBI) Special Agent Josh Anderson testified that he was assigned as the lead investigator in the victim's murder. Special Agent Anderson stated that he received a call late on August 10, 2021, concerning a homicide in Red Boiling Springs. He testified that, after he responded to the crime scene, the victim's family members informed him that the victim's 2019 red Nissan Rogue was missing. After Special Agent Anderson confirmed the victim's ownership of the vehicle, law enforcement issued a BOLO for the missing vehicle, including its description and license plate number. Special Agent Anderson testified he later updated the BOLO to "advise[ ] that [the Defendant] was possibly in possession of the vehicle, . . . that he was possibly armed and dangerous," and that the Defendant was a person of interest in a homicide. He testified that he was notified that the vehicle's license plate was "captured on a license plate reader" traveling westbound in Texas, near the Mexican border. Special Agent Anderson then had the previously issued BOLO "push[ed] out towards the El Paso area and Las Cruces." He received information that authorities would possibly be "trying to intercept that vehicle at a checkpoint near Las Cruces, New Mexico. He recalled that he thereafter received a phone call from Jose Portero, a USBP supervisor, who informed him that USBP agents had stopped the vehicle. Agent Portero also informed Special Agent Anderson that the Defendant was the sole occupant of the vehicle and that the Defendant appeared to have blood on his clothing. Special Agent Anderson testified that he played no part in the initial search of the 2019 Nissan Rogue.

Special Agent Anderson testified that he traveled to Las Cruces and found that the Defendant had been taken to the Dona Ana Correctional Facility. Special Agent Anderson

notified the Red Boiling Springs Police Department (RBSPD) of the Defendant's location and arranged transportation for the Defendant back to Tennessee. Special Agent Anderson then visited the Defendant at the correctional facility and learned that the vehicle was being transported from the Las Cruces USBP checkpoint to another nearby secure facility. Special Agent Anderson testified that, on August 12, 2021, he took possession of the vehicle, which was already sealed, loaded it onto a car hauler behind a U-Haul truck, and brought it back to Tennessee. He testified that he did not enter or remove anything from the vehicle but that the integrity seals on its doors were lost in transit.

On August 15, 2021, Special Agent Anderson submitted a request to the TBI Crime Laboratory to process the vehicle, including serology and inventory. He explained that law enforcement needed to impound and process the vehicle, including taking an inventory of all items inside and documenting them. Special Agent Anderson testified that this was the typical procedure when the TBI brings a vehicle into its impound area. He testified that he was not involved in the processing of the vehicle.

Special Agent Anderson also testified that he received the Defendant's clothing, shoes, and miscellaneous items from USBP authorities in Las Cruces, and these items were also submitted for testing in Tennessee. He testified that some of these items, including the Defendant's clothing, appeared to have reddish-brown stains. He also stated that he took possession of a .22 Beretta firearm discovered in the Defendant's vehicle by USBP authorities. In addition, Special Agent Anderson testified that on August 17, 2021, he obtained a search warrant for the vehicle, which was executed the same day. Both the Beretta and the blood on the clothing were included in the affidavit in support of the search warrant.

At the conclusion of the proof, the State argued the August 11, 2021, search was valid as an exception to the warrant requirement because it was a consent search due to the lack of coercion or threats and the Defendant's permission and assistance in retrieving his medication; a valid border-search of the Defendant's vehicle as he was attempting to cross the border; a search incident to arrest because it was reasonable to believe that the vehicle contained evidence of an offense; and an automobile search under the *Carroll* doctrine. In addition, the State argued that the search was a valid inventory search by law enforcement and a valid search incident to a search warrant, which even without a valid warrantless search exception would permit the introduction of the firearm pursuant to both the inevitable discovery doctrine and the independent source doctrine. The Defendant argued that the evidence did not support the State's arguments and that suppression should be granted.

Following arguments, the trial court denied the Defendant's motion to suppress. The trial court found that there was valid consent to search and a valid search incident to

arrest. The trial court did not address the automobile exception and did not clearly rule on the border-search exception at the hearing. In addition, the trial court found that a valid inventory search, combined with the inevitable discovery doctrine, supported the denial of the motion to suppress. The trial court further found that a valid search warrant existed and that, even if the .22 Beretta was excluded from the affidavit in support of the search warrant, probable cause still existed to support its validity. Accordingly, the trial court found multiple exceptions to the warrant requirement supported the search.

## B. TRIAL

Macon County Sheriff Joseph Wilburn[1] testified that on August 10, 2021, he was employed as a police officer in Red Boiling Springs and that he responded to the scene of a possible deceased person at a home on McClure Street. Officer Wilburn testified that he found some of the victim's family members standing outside the home when he arrived. Officer Wilburn spoke with the victim's family members and then entered the home, where he saw a deceased woman, clothed only in her panties, lying on her side in a recliner and covered by a thin sheet. Officer Wilburn noticed the victim had blood near her ears and discoloration around her right eye; he testified the discoloration was common with a gunshot wound. He testified he noticed a spent shell casing on the recliner near the victim's head.

Officer Wilburn testified that he exited the home to speak with the victim's family members again when emergency medical services arrived. The victim's family members informed Officer Wilburn that the victim lived in the residence with her husband, the Defendant, and that they did not know if anyone else was in the home. The victim's family members also stated that a vehicle was missing. Officer Wilburn then instructed emergency medical services to exit the home, so it could be cleared. While clearing the house with another officer, Officer Wilburn saw a dog pen area in the kitchen with blood spatter on the wall and three dead dogs. In the room where the victim was located, he saw another dead dog covered with a blanket. Officer Wilburn testified that the Defendant was not at the residence. After clearing the home, Officer Wilburn secured the crime scene. He testified that the TBI later collected evidence and processed the crime scene.

Amy Sanders testified that the victim, whom she talked to daily, was her aunt and best friend. She described the victim as an animal lover who owned four dogs and two cats. Ms. Sanders testified that she texted the victim at approximately 10:00 a.m. on August 10, 2021, while she was at work. When the victim did not respond, she thought the victim

---

[1] Joseph Wilburn testified that he was elected Macon County Sheriff by the time of the Defendant's trial. For clarity, we will hereafter refer to him as "Officer Wilburn," the rank he held at the time of the events giving rise to the Defendant's charges in this case. We intend no disrespect.

was probably asleep because it was her day off. She further testified that at approximately 4:00 p.m., she was contacted by an individual, whom she referred to as "Ninja Buffalo." Ms. Sanders explained that "Ninja Buffalo" lived in California and routinely played online games with her, the victim, and the Defendant. She testified that he asked if she had spoken to the victim and that she told him the victim might still be asleep. At approximately 4:30 p.m., "Ninja Buffalo" contacted Ms. Sanders again to tell her that the victim's "shields ha[d] dropped" in an online game. Ms. Sanders testified that this concerned her because the victim had never dropped her shields before. She testified that she again tried to reach the victim by texting and calling her, with no response. She testified that she also attempted to contact the Defendant by texting and calling him, but she similarly received no response.

Ms. Sanders testified that she thereafter contacted her mother to ask if she could check on the victim. Ms. Sanders's mother did not want to go alone but agreed to accompany Ms. Sanders to check on the victim, and Ms. Sanders then drove to pick her mother up at her home in Lebanon. Ms. Sanders also called her brother and sister-in-law, Jeffrey and Shannon Jones, to ask them to check on the victim. Ms. Sanders testified that she and her mother arrived at the victim's home at about 6:00 p.m. and that a vehicle was missing. She stated that they thought that the victim may have been at either a doctor's appointment or out, so they waited, but the victim did not return. Ms. Sanders then called the victim's employer, who suggested that they check the local Walmart store. Ms. Sanders also knocked on the door and noted that no dogs barked in response, which she described as odd. Ms. Sanders testified that she and her mother then went to Walmart, but the victim's car was not there, so they returned to the victim's home. She testified it was dark outside when they returned, but the home and driveway were brightly lit.

Ms. Sanders stated she thereafter called her brother again because he was a locksmith. Her sister-in-law called hospitals, and when she and Ms. Sanders's brother arrived at the victim's home, Jeffrey unlocked the door. Ms. Sanders entered the home and called the victim's name. Ms. Sanders then saw the victim in the recliner where she normally slept. The only light in the room was from the television. She testified the victim did not move and that when she touched the victim, the victim was "freezing." She stated she noticed "a big chunk of something on the side of [the victim's] ear, with blood coming all down [the victim's] neck." Ms. Sanders testified that she screamed and her mother came inside and started shaking the victim's forearm. Ms. Sanders testified that her mother then ran from the house telling others to call 911, which Ms. Sanders's sister-in-law did.

Ms. Sanders stated that first responders arrived within five to ten minutes, with a police officer being the first on the scene. She testified that they spoke with the officer and informed him that a vehicle was missing and that the Defendant was not there. Ms. Sanders reentered the home with the officer and advised him that the victim had dogs. When the officer shined his flashlight on the victim and the floor, they saw one deceased dog. The

police officer then told Ms. Sanders to exit the home. She testified that no one else was in the house. Ms. Sanders stated that a large number of law enforcement officers later arrived and that she was interviewed by a TBI agent.

Ms. Sanders described the relationship between the Defendant and the victim as "pretty distant," almost like that of roommates. She explained that the victim typically slept on a recliner in one room and the Defendant had his own room. She stated this had been the situation for a long time.

TBI Special Agent Andrew Graves testified that he received a call on August 10, 2021, to respond to the scene of the victim's homicide. He testified that his job was to assist Special Agent Josh Anderson, the lead investigator on the case. Special Agent Graves stated that he arrived at the scene just after midnight and was briefed by those already there. He stated that he, along with another agent, processed the scene and wrote a corresponding report, noting which items were located at the scene, where they were located, and the marker numbers associated with each item. He stated that they took photographs and interviewed family members. He testified that two cartridge cases were recovered near the victim's body, one cartridge case was discovered near one dog's body in the room with the victim, and three cartridge cases were discovered near the three dogs' bodies in the kitchen.

Michael Towns testified that he worked as a veterinarian and that "a fellow with the TBI" requested that he perform x-rays on four deceased dogs to determine if they had been shot. Dr. Towns identified x-rays and photographs of each of the four dogs and explained that the cause of death for each dog was a gunshot wound. The dogs were then released to the victim's family but later returned in order to have blood samples drawn. Dr. Towns testified that he collected the blood samples from each of the dogs and returned the deceased dogs to the TBI.

John Cook testified that, although he did not know the Defendant or the victim, his relatives owned the farmland around the Defendant's and the victim's home, and he often saw them together outside. Mr. Cook stated that the victim always seemed to be helping the Defendant, who appeared to have "a problem walking." He testified that around noon on August 10, 2021, he drove to his relatives' home near the victim's residence and saw the victim's small burgundy Nissan SUV on a small logging road between the properties. He testified he had not seen it there before, so he slowed to see if there was a problem; he saw the Defendant urinating next to the SUV, so he did not stop. He testified it was the first time he had seen the Defendant alone. Mr. Cook testified that when he left his relatives' home about thirty minutes later, both the vehicle and the Defendant were gone.

On cross-examination, Mr. Cook testified that he had pulled up to within ten feet of the SUV's bumper. He also testified that he recognized the Defendant by his stance and that he was positive that the man he saw was the Defendant.

TBI Special Agent Andrew Vallee testified that he was assigned to the TBI's Cellular Analysis Survey Team, which handled mapping cellular records, conducting radio frequency surveys, performing electronic surveillance, and determining where devices were located at a given time. Special Agent Vallee stated that he was contacted about the victim's case by TBI Special Agent Anderson on August 10, 2021, to make an exigent request of Verizon Wireless for the Defendant's cell phone data. He averred that such a request would include both historical data and real-time location data of where the device was at a given time. Special Agent Vallee testified that he made the request to Verizon, and that Verizon subsequently sent him data pertaining to the Defendant's cell phone number. Based upon the data, Special Agent Vallee testified that the Defendant's cell phone was in the area of the crime scene on August 10, 2021, at 1:11 p.m. The data then showed the Defendant's cell phone moving away from the crime scene and arriving in Hartsville at approximately 1:45 p.m. Soon, the Defendant's cell phone lost network connection. Special Agent Vallee testified that the data next placed the Defendant's cell phone in Prattville, Alabama, from 10:55 p.m. on August 10, 2021, until 3:38 a.m. on August 11, 2021. The cell phone was then turned off and never turned back on, and no more data was received.

Special Agent Vallee testified that the fastest drive time from the crime scene to Prattville was five hours and fifteen minutes, but the time between the two locations, based on the data, was thirteen to fourteen hours. Special Agent Vallee testified that license plate information was also received via email and that the victim's missing vehicle was westbound on I-10 in Sierra Blanca, Texas, on August 11, 2021, at 6:32 p.m.

USBP Agent Daniel Myers testified that he was assigned to the I-10 checkpoint in Las Cruces. Agent Myers testified that the checkpoint was approximately twenty-five to thirty miles from the Mexican border. Agent Myers testified that while he was on duty on August 11, 2021, he was advised of information from a BOLO. Agent Myers averred that the BOLO contained information concerning the vehicle's identification, license plate, and the vehicle's driver's identity, picture, name, height, and weight. The BOLO also warned that the driver was "an armed and dangerous murder suspect." Agent Myers testified that he was informed that a vehicle matching the information contained in the BOLO was approaching the I-10 checkpoint. He later saw a red SUV driving towards his checkpoint. Agent Myers testified that, after verifying that the SUV was the one from the BOLO and the vehicle stopped, he and another officer drew their weapons; he then removed the Defendant from the vehicle, handcuffed him, performed a *Terry* pat-down for officer safety, and placed him in a nearby sedan. The Defendant provided his name when asked.

During the pat-down search, Agent Myers discovered a "wad of coins," a pocketknife, and a wallet containing the Defendant's identification. The information on his identification matched the suspect's information on the BOLO. Agent Myers testified that although he did not personally take the Defendant's clothes, other agents collected the Defendant's clothing, including a dark-colored T-shirt, blue jeans, and socks. He could not recall what type of shoes the Defendant was wearing. He testified that he secured the Defendant in a holding cell and started preparing his reports on what had occurred. The Defendant and the evidence were taken from the checkpoint to the main station.

USBP Agent Erika Moody testified she was also at the checkpoint with Agent Myers on August 11, 2021. She testified that she primarily served as backup and had no physical contact with the Defendant. She testified she suggested that the Defendant's clothing be collected as evidence after she observed blood on his socks. She recalled that the Defendant had been wearing brown boots. She also recalled that the Defendant later received a medical examination.

USBP Agent Jaime Gutierrez testified he was also at the checkpoint on August 11, 2021. Agent Gutierrez testified that after the Defendant was removed from the vehicle, he cleared it to ensure no one else was inside. The Defendant was taken into the checkpoint, and another agent drove the vehicle and secured it. Agent Gutierrez testified that Agent Lilian Marshall later went to the vehicle to retrieve the Defendant's medication. He recalled that Agent Marshall called him to the vehicle to show him she had found a firearm inside an insulated cloth "lunch bag" within the vehicle. Agent Gutierrez testified that he retrieved the firearm and took it into the checkpoint. He testified that the firearm was recovered from the passenger front seat. Agent Gutierrez sealed the firearm inside a bag for transportation. The Defendant and his belongings were then transported from the checkpoint to the main station by the arresting agents. Agent Gutierrez identified the firearm as a .22 Beretta.

USBP Agent Nathan Jackson testified that he was also at the I-10 checkpoint on August 11, 2021. Agent Jackson stated that when the Defendant's vehicle approached the checkpoint, he spoke with the Defendant and confirmed that the Defendant was a United States citizen. He stated that Agent Myers was the person who removed the Defendant from the vehicle. He testified that the Defendant was handcuffed, and his pockets were checked. Agent Jackson testified that he continued to watch the traffic behind the Defendant's vehicle after the Defendant was removed from the vehicle. After the Defendant was taken into the building, Agent Jackson moved the Defendant's vehicle out of the way, so traffic could keep moving. He recalled that the Defendant was wearing jeans, a T-shirt, and some type of boots. Agent Jackson recalled seeing Agent Gutierrez carrying a .22 Beretta into the building. He also recalled other agents having issues clearing

- 9 -

the firearm of ammunition; because he personally owned firearms of this type, he explained to them how to clear it.

TBI Special Agent Joshua Anderson testified that he was assigned as the lead investigator in the victim's murder. Special Agent Anderson recalled that he received a call late on August 10, 2021, concerning the death of the victim and that he responded to the crime scene. When he arrived, other TBI agents, local law enforcement, and some of the victim's family members were at the crime scene. He stated that the victim was found wearing only panties and covered by a thin sheet.

Special Agent Anderson testified that law enforcement initially thought there was a possibility that the Defendant could also be a victim. Therefore, it was decided it could be of great importance to track the Defendant's location. The next day, he was contacted by a USBP agent supervisor, who informed him that the Defendant had been located. Special Agent Anderson testified that he and another agent flew to Las Cruces and spoke with USBP agents. He stated that USBP agents turned over some sealed items they had collected as evidence, which included the Defendant's clothing, boots, and the .22 Beretta. The Defendant was transported back to Tennessee by the Macon County Sheriff's Office.

Special Agent Anderson testified that he was involved in issuing the BOLO in this case, which initially included information indicating that the victim's vehicle was stolen. He stated that the BOLO was later updated to note that the vehicle may be occupied by the Defendant and to describe the Defendant as potentially armed and dangerous and a potential suspect in a homicide.

TBI Special Agent David Howell testified that he was a forensic scientist assigned to the TBI's Latent Fingerprint Unit, and he examined the six cartridge cases found at the crime scene. No latent prints were found on any of the cartridge cases. He testified that this was not unusual, based on the fact that the heat from firing the gun would generally eliminate any fingerprints. Special Agent Howell testified that he did not test the .22 Beretta for fingerprints.

TBI Special Agent Alyssa Manfredi testified that she was a forensic scientist assigned to the TBI's Forensic Biology or Serology and DNA Unit. She testified that she examined the 2019 Nissan Rogue by taking photographs and performing an inventory search. She inventoried various items, including clothing, shoes, charging cables, and a cell phone charger. In addition, she collected swabs for testing from the vehicle's steering wheel, the gear shift, and some stains in the vehicle. She testified that presumptive chemical testing did not indicate the presence of blood on the interior of the vehicle. Special Agent Manfredi testified that she also tested various clothing items and shoes found in the car and taken from the Defendant, which indicated the presence of blood. She also

- 10 -

noted the presence of blood on the Defendant's shoes, left boot, jeans, and socks. She stated that the blood on the Defendant's left shoe was not human blood.

Special Agent Manfredi testified that she could not match any of the male blood to the Defendant because she did not have a sample of his blood. She also could not match the victim's blood because the mixture of the blood in the stains made it impossible to match.

Dr. Miguel Laboy testified that he was the medical examiner who performed the victim's autopsy. He testified that the victim's cause of death was two fatal gunshot wounds to her head, one of which was fired at close range and the other at intermediate range. He opined that the close-range gunshot wound was inflicted first.

TBI Special Agent Ladd Kuykendall testified that he was a forensic scientist in the TBI's Firearms and Toolmark Identification Unit and that he examined the Defendant's .22 Beretta firearm recovered by USBP agents. He test-fired the firearm and compared it to six cartridge cases recovered from the victim's home near her body and the deceased dogs. He testified that all six cartridge cases were fired from the Defendant's Beretta. However, he could not conclusively match the bullets recovered because they were too damaged.

The State rested. Following a *Momon* hearing, the Defendant elected not to testify and presented no additional proof. Upon this proof, the jury convicted the Defendant as charged. On July 31, 2023, the trial court imposed an effective sentence of life imprisonment following a sentencing hearing. On August 14, 2023, the Defendant filed a "Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing." On October 2, 2023, the trial court entered judgments of conviction for all five counts. On January 22, 2025, the Defendant filed a "Memorandum in Support of Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing." On February 3, 2025, the trial court held a hearing on the Defendant's post-trial motion and memorandum, and on April 30, 2025, the trial court entered a written order denying the Defendant's motion.

The Defendant filed a notice of appeal on May 19, 2025.

## II.   ANALYSIS

On appeal, the Defendant claims that the trial court erred by denying his motion to suppress the firearm seized during the warrantless search of his vehicle and that the evidence of premeditation is insufficient to support his conviction for first degree murder. The State responds that the appeal should be dismissed as untimely and that the interests of justice do not warrant a waiver of untimeliness; alternatively, the State argues that the

Defendant's issues are without merit and that the trial court judgments should be affirmed. As it is potentially dispositive, we first address this appeal's timeliness.

## A. TIMELINESS

The State argues that this appeal should be dismissed because the Defendant did not file a timely motion for a new trial, because his notice of appeal was untimely, and because he failed to acknowledge the untimeliness or else to request waiver of the timely filing requirement in his initial brief. In his reply brief, the Defendant argues that he filed a timely skeletal motion for a new trial, which tolled the time for filing his notice of appeal. In addition, the Defendant argues that if the motion for a new trial is deemed untimely, then it is in the interest of justice to waive any untimeliness of his notice of appeal and hear this appeal on the merits.

Tennessee Rule of Appellate Procedure 4(a) requires that a notice of appeal be "filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from[.]" Certain specifically enumerated motions may toll the thirty-day timeframe for timely filing a notice of appeal, including a motion for a new trial. Tenn. R. App. P. 4(c). When a defendant files a timely motion for new trial, "the time for appeal for all parties shall run from entry of the order denying a new trial or granting or denying any other such motion or petition." *Id.*; *see also State v. Byington*, 284 S.W.3d 220, 225 (Tenn. 2009). But because an untimely motion for a new trial is a legal nullity, it cannot toll the thirty-day timeframe for filing a timely notice of appeal. *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. 1989).

Tennessee Rule of Criminal Procedure 33(b) requires that a motion for a new trial be made in writing "within thirty days of the date the order of sentence is entered" to preserve issues for appellate review." The thirty-day timeframe imposed by Rule 33(b) may not be extended by the trial court, *see* Tenn. R. Crim. P. 45(b)(3), and a trial court is without jurisdiction to consider an untimely filed motion for a new trial, *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). When a defendant files an untimely motion for a new trial, the trial court must dismiss the motion. *Dodson*, 780 S.W.2d at 780 (citing *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984)). Moreover, the fact that a trial court considers and rules on an untimely motion for a new trial does not preserve the issues raised therein for appellate review. *State v. Lowe-Kelley*, 380 S.W.3d 30, 34 (Tenn. 2012); *Dodson*, 780 S.W.2d at 780. Accordingly, when a defendant fails to timely file a motion for a new trial, "all issues are deemed waived except for sufficiency of evidence and sentencing." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223, 242 (Tenn. 2024).

The State argues that the Defendant's "Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing" was not a properly filed motion for a new trial because it failed to raise a specific claim and was merely a motion for an extension of time to file a motion for a new trial, which does not toll the filing of the notice of appeal. *See State v. Blunkall*, 731 S.W.2d 72, 74 (Tenn. Crim. App. 1987). The State argues that the heading and the content of the motion should be read separately, and that the content alone is insufficient to qualify as a motion for a new trial.

The Defendant's "Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing" reads as follows:

The Defendant[,] Joseph E. Chestnut, Jr., through undersigned counsel, hereby files this Motion as Notice to preserve his rights to seek that this Honorable Court set aside the verdict of the jury and enter a judgment of acquittal on all counts, grant him a new trial on all counts, or grant him a new sentencing hearing. *See* [Tenn. R. Crim. P.] 29, 33. The Defendant has received the transcript for the trial on the merits during the week of 07 AUG 2023, and the Defendant is in the process of reviewing same and requesting the sentencing transcript. Therefore, the Defendant respectfully request[s] a status date in October 2023, by which time the Defendant anticipates having sufficient information and time to file an amended Motion and a Memorandum in support of any or all of these requests for relief, thereby providing notice to the State of Tennessee and opportunity to set the hearing date.

A motion for a new trial "should set forth the factual grounds on which error is alleged, the legal grounds on which the trial court based its actions, and a concise statement asserting the legal reasons why the court's decision was improper." *Lowe-Kelley*, 380 S.W.3d at 34 (citing *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (internal quotation marks omitted). In *Lowe-Kelley*, the Tennessee Supreme Court considered whether a motion for a new trial that contains no specific grounds for relief may satisfy the requirements of Tennessee Rule of Criminal Procedure 33(b). 380 S.W.3d at 33. In that case, the defendant's motion stated,

Comes now the defendant by and through counsel of record and hereby files this Motion for New Trial in accordance with the [sic] Rule 33 of the Tennessee Rules of Criminal Procedure and accordingly seeks this Honorable Court to grant this motion and grant him a new trial. This motion is filed concurrently with a Motion to Withdraw filed by the undersigned counsel of record and done so to preserve defendant's rights to seek a new trial and preserve his rights on appeal. Accordingly, defendant asks this

Honorable Court to allow liberal time under the Rules of Criminal Procedure
for the filing of amendments to this Motion for New Trial.

*Id*. at 32. The *Lowe-Kelley* Court concluded that the defendant's motion qualified as a sufficient and timely motion for a new trial because it was "timely filed within thirty days after the trial court entered its judgment, referenced a motion for new trial, and specifically requested relief in the form of a new trial." *Id*. at 34. It further noted that the defendant's motion was distinguishable from motions simply requesting the extension of time to file a motion for a new trial or for permission to file an amendment to an overruled motion for a new trial and concluded that the defendant's "timely motion unequivocally stated the purpose of the motion and the relief requested." *Id*. (first citing *Blunkall*, 731 S.W.3d at 74; and then citing *Hatcher*, 310 S.W.3d at 803).

Here, we do not agree with the State that the Defendant's motion is merely a motion for an extension of time in which to file a motion for a new trial. When read in its totality, including both the heading and the text of the motion, the Defendant's motion qualifies as a "skeletal" motion for a new trial. The heading of the motion specifically sought a new trial, and the first line of the pleading stated that it sought "to preserve" the Defendant's rights to seek the relief referred to, similar to the language the *Lowe-Kelley* Court approved. In addition, the Defendant's motion sought leave to file an "amended" motion and memorandum in the future to supplement the original skeletal motion because he had only received the transcripts one week prior to the deadline for the motion, which he stated was insufficient time to develop the specific grounds for his motion. The Defendant's skeletal motion, therefore, sufficiently satisfies the *Lowe-Kelley* requirements for a skeletal motion for a new trial by requesting the appropriate relief without specifically setting forth the factual claims.[2] Here, following a July 2023 sentencing hearing, the Defendant filed a "Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing" on August 14, 2023.[3] On October 2, 2023, the trial court entered judgments of conviction for all five counts, and the Defendant filed a "Memorandum in Support of Motion for Judgment of Acquittal or for a New Trial or a New Sentencing Hearing" on January 22, 2025. On February 3, 2025, the trial court held a hearing on the Defendant's post-trial motion and memorandum, and on April 30, 2025, the trial court entered a written order denying the Defendant's motion. The Defendant filed his notice of appeal within thirty days of that ruling. Accordingly, the Defendant's skeletal motion tolled the time for the

---

[2] "Although attorneys are not advised to 'make a regular practice of filing only a skeletal motion with the intention of bringing all of their substantive grounds in an amendment' to the motion for a new trial, the Advisory Commission's comments anticipate the possibility that the circumstances of a case may require a 'skeletal motion.'" *Lowe-Kelley*, 380 S.W.3d at 34 (citing Tenn. R. Crim. P. 33, Adv. Comm. Cmt.).

[3] The State did not object to the premature filing of the motion.

- 14 -

filing of the notice of appeal. As the notice of appeal was filed within thirty days of the ruling on the motion for a new trial, it is timely.

## B. MOTION TO SUPPRESS

The Defendant argues that the trial court erred by denying his motion to suppress the firearm recovered after a warrantless search of his vehicle at the border checkpoint in Las Cruces. The Defendant argues that no exception to the warrant requirement applies to authorize the search and that neither the inevitable discovery doctrine nor the independent source doctrine allows for admission of the firearm. Specifically, the Defendant challenges the trial court's findings that the consent, automobile search, border-search, and search incident to a lawful arrest exceptions to the warrant requirement apply. The Defendant further argues that the inevitable discovery and independent source doctrines do not permit admission of the firearm as related to an inventory search, a search incident to an arrest, and a valid search warrant. The State responds that the trial court appropriately denied the Defendant's motion to suppress because the record indicates that the Defendant consented to the search. The State further responds that the inevitable discovery doctrine and the independent source doctrine support the admission of the firearm pursuant to an inventory search and a valid search warrant. The State does not rely upon the issues of an automobile search or a border search, or on the issue of inevitable discovery pursuant to a search incident to an arrest.

Our standard of review of a trial court's disposition of a motion to suppress evidence is layered. We are bound by the trial court's findings of fact unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Issues of witness credibility, the weight and value of the evidence, and the resolution of conflicting evidence "are matters entrusted to the trial judge as the trier of fact." *Id*. In light of this deferential standard of review, on appeal, the prevailing party on a motion to suppress evidence "is entitled to the strongest legitimate view of the evidence, as well as all reasonable and legitimate inferences that may be drawn from the evidence." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). However, we review the trial court's conclusions of law de novo. *State v. Keith*, 798 S.W.2d 861, 864 (Tenn. 1998).

Both the Constitution of the United States and the Constitution of Tennessee protect against unreasonable searches and seizures. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Tenn. Const. art. 1, § 7 (providing "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures"). Tennessee's protections against unreasonable searches and seizures are identical to those guaranteed by the Fourth Amendment to the Constitution of the United States. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). A search or seizure

- 15 -

performed without a valid warrant is generally presumed to be unreasonable. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Bridges*, 963 S.W.2d at 490. Any evidence recovered from a warrantless search or seizure is subject to suppression "unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see also State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (first citing *Vale v. Louisiana,* 399 U.S. 30, 34 (1970); and then citing *State v. Hayes,* 188 S.W.3d 505, 511 (Tenn. 2006)). These exceptions include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005).

## 1. Consent

The Defendant argues that the trial court erred in denying his motion to suppress on the ground of his consent, claiming that he did not provide express, unequivocal consent to Agent Marshall's search of his vehicle. In addition, the Defendant argues that even if consent was established, Agent Marshall's search exceeded the scope of that consent. The State argues that the trial court properly found that the Defendant consented to USBP agents' warrantless search of his vehicle and that the search did not exceed the scope of his consent.

As stated previously, it is an exception to the warrant requirement that a law enforcement officer may search a person's vehicle without a warrant if the officer obtains the person's consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Id.* 412 U.S. at 227; *Cox*, 171 S.W.3d at 184. To be valid, consent must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Berrios,* 235 S.W.3d 99, 109 (Tenn. 2007) (quoting *State v. Simpson,* 968 S.W.2d 776, 784 (Tenn.1998) (internal quotation marks omitted)).

"The standard for measuring the scope of consent is that of objective reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect." *State v. Brown*, 294 S.W.3d 553, 563 (Tenn. 2009) (quoting *State v. Troxell*, 78 S.W.3d 866, 872 (Tenn. 2002)) (internal quotation marks omitted). "The expressed object of the search is relevant to the understanding of a 'typical reasonable person.'" *Brown*, 294 S.W.3d at 563 (citing *Troxell*, 78 S.W.3d at 871-72). Additional factors "include any express or implied limitations regarding the permissible scope of the search in terms of time, duration, area, or intensity." *Brown*, 294 S.W.3d at 563. We use "a common-sense interpretation to the verbal exchange between an officer and a suspect" when considering the scope of consent. *Id*.

The Defendant asserts that the evidence was insufficient to establish his consent because his responses were equivocal, and he merely failed to actively oppose the search. In *State v. McMahan*, the defendant allowed an officer to enter his home to "talk to him," but there was never any mention of a search or explicit permission to search; the State argued that the permission was by implication because McMahan did not actively oppose the search, but the court found that the "[f]ailure to actively oppose a search being undertaken by law enforcement officers does not constitute the giving of free and voluntary consent." *State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). Unlike the defendant in *McMahan*, the Defendant here was fully informed of the facts underlying the request to search for his medication prior to giving his consent by specifically describing where to locate his medication in a container within his vehicle. *See State v. Stewart*, No. M2001-01056-CCA-R3-CD, 2002 WL 242349, at *3 (Tenn. Crim. App. Feb. 15, 2002) (distinguishing *McMahan* where a defendant is fully informed of the facts underlying the request to search prior to giving his consent), *perm. app. denied* (Tenn. Oct. 21, 2002).

Agent Marshall testified that she followed the USBP's standard procedures with the Defendant after he advised her that he was diabetic and took medication for his diabetes. The Defendant advised that while he did not immediately need his medication, he would need it in the near future, and that it was in the vehicle. Although the Defendant complains that the trial court found Agent Marshall's testimony to describe the Defendant's consent as "iffy," the trial court specifically credited Agent Marshall's testimony concerning the limited verbal consent provided by the Defendant to locate his medication within a container in the vehicle when the Defendant actually described the bag containing the medication and the location within the vehicle where the bag was located. The Defendant was clearly aware of the purpose of the limited search. After a review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the Defendant voluntarily and validly consented to the limited search of his vehicle for his medication, which led to the discovery of the firearm in the same container as the medication.

The Defendant also claims that, even if he consented to the search, Agent Marshall's search nevertheless exceeded the scope of his consent. In this case, Agent Marshall specifically asked whether the Defendant had any medical issues and then questioned him further after the Defendant disclosed that he was diabetic. She also asked the Defendant if he took medication for his diabetes, and the Defendant replied affirmatively. Agent Marshall then asked the Defendant whether he had his medication, when he needed it, and when he had last eaten. The Defendant responded that he did not immediately need his medication, but that he would need it, and that it was not on his person. Agent Marshall advised that she could get the Defendant's medication, and the Defendant told her where his medication was located within his vehicle. He specifically stated that his medication was stored in a "cooler-type bag" or container. Agent Marshall testified that she went to

the area of the Defendant's vehicle he described but that the first container she saw that matched the Defendant's description did not contain his medication. Agent Marshall looked in another part of the vehicle's interior and saw a second container that also matched the Defendant's description. Upon opening this container, Agent Marshall saw the firearm and then backed away to get another agent or supervisor. The supervisor removed the firearm. Agent Marshall then looked again in the container and found the Defendant's medication.

In this case, a reasonable person would have understood Agent Marshall's request to retrieve the Defendant's medication as a request for permission to conduct a limited search of the vehicle for the medication. The expressed object of the search was the Defendant's diabetes medication, which he described as being located within a container. Agent Marshall expressly limited the duration and scope of the search by asking only to retrieve the medication, and the Defendant described the container within which it was located. Under a common-sense interpretation of the entire verbal exchange, a reasonable person would have understood that consent to search included consent to conduct a quick search of the vehicle's interior to locate the container holding the Defendant's medication. The record establishes that Agent Marshall conducted the search and quickly found the container in the vehicle. The search was well within the scope of consent. The trial court appropriately denied the Defendant's motion to suppress on this basis.

Because we conclude that the trial court appropriately denied the Defendant's motion to suppress pursuant to the consent to search exception to the warrant requirement, we need not address the remaining issues the Defendant raises. *State v. Washington*, --- S.W.3d ---, 2025 WL 2847585, at *9 n.10 (Tenn. Oct. 8, 2025). Nevertheless, in the event of further appellate review, we will briefly discuss them.

2. Border-Search

The Defendant argues that the border-search exception does not apply because it is governed by the "interior fixed-checkpoint doctrine," citing *State v. Sanchez*, 350 P.3d 1169, 1175 (N.M. 2015). At the hearing on the motion to suppress, the trial court did not clearly rule on the issue of the border-search exception, but in the trial court's order denying the Defendant's motion for a new trial, the trial court found that the denial of the motion to suppress was appropriate because "the actions of the border patrol agents were within their capacity and occurred at a border station or its functional equivalent and qualif[ied] as a border search."

The border-search doctrine is an exception to the warrant requirement for a search. *See Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021). "Border searches may be conducted at (1) the physical border, (2) the 'functional equivalent' of the border, or (3)

the 'extended' border." *United States v. Rodriguez-Garcia*, 790 F. Supp. 3d 67, 75 (D.N.H. 2025) (citing *United States v. Perez Rivera*, 247 F. Supp. 2d 108, 114 (D.P.R. 2003)) (footnote omitted). The "functional equivalent" of the border is the first point at which an entrant may practically be detained. *United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir. 1993); *see also Almeida-Sanchez v. United States,* 413 U.S. 266, 272 (1973). However, this border-search exception does not apply to searches at border checkpoints farther within this country. *See Sanchez*, 350 P.3d at 1174-75.

There is no dispute that the search of the Defendant's vehicle occurred at the I-10 Checkpoint in Las Cruces, which according to USBP Agent Myers is approximately twenty-five to thirty miles from the international border between the United States and Mexico. Therefore, the border-search warrant exception does not apply, and the "interior fixed-checkpoint doctrine" is not an exception to the warrant requirement because the I-10 checkpoint is not a border checkpoint, but rather an identification-type checkpoint many miles from the actual border. *Id*. *See State v. Hayes*, 188 S.W.3d 505, 511 (Tenn. 2006) (concluding that a warrantless stop of a driver at an identification checkpoint did not fall under an exception to the warrant requirement). We agree with the Defendant that the trial court erred in finding that the border-search exception applied to the facts of this case.

### 3. Automobile Search

The Defendant argues that the automobile exception to a search warrant does not apply because the State failed to establish that Agent Marshall believed she would find evidence of a crime by searching the vehicle for the Defendant's diabetes medication, and thus that there was no probable cause to support an automobile exception. The trial court did not address this issue in its ruling at the suppression hearing. In its written order denying the Defendant's motion for a new trial, the trial court found that "[f]acts constituting probable cause would include the BOLO which matched the Defendant and the vehicle with same tag number attempting to leave the country." The trial court further concluded that the search was valid pursuant to *Carroll v. United States*, 267 U.S. 132, 149 (1925).

In *Carroll v. United States,* 267 U.S. 132, 149 (1925), the United States Supreme Court held that law enforcement authorities may stop and search a vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband. The rationale for this automobile exception to the warrant requirement is twofold: (1) the impracticability of obtaining a search warrant in light of the inherent mobility of an automobile; and (2) the reduced expectation of privacy with respect to one's automobile. *California v. Carney,* 471 U.S. 386, 393 (1985); *see also South Dakota v. Opperman,* 428 U.S. 364, 367 (1976). Post-*Carroll,* the Supreme Court has extended this exception to include searches of containers within an automobile capable of concealing the object of the

search.  *See United States v. Ross,* 456 U.S. 798, 824 (1982); *see also Wyoming v. Houghton,* 526 U.S. 295, 307 (1999).

However, in this case, according to Agent Marshall, the object of the search was not contraband, but rather the Defendant's diabetes medication.  The State has put forth no argument to support the automobile exception's application here.  We agree with the Defendant that the trial court erred in finding that the automobile exception applied to the facts of this case.

### 4. Inevitable Discovery or Independent Source Doctrine

The Defendant also claims that the firearm would not have been inevitably or independently discovered pursuant to a search incident to arrest, an inventory search, or a valid search warrant.  The State responds that the firearm would have been inevitably or independently discovered under either the inventory search or the valid search warrant.

"Under the inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means." *State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (first citing *Nix v. Williams,* 467 U.S. 431, 444 (1984); and then citing *State v. Ensley,* 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996)). Evidence of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix,* 467 U.S. at 444 n. 5.

The independent source doctrine applies to evidence initially obtained illegally but later obtained independently from "activities untainted by the initial illegality." *See Murray v. United States,* 487 U.S. 533, 537-39 (1988); *see also State v. Smith,* No. W2009-02678-CCA-R3-CD, 2011 WL 6885348, at *6 (Tenn. Crim. App. Dec. 27, 2011) (concluding that the independent source doctrine "permits the state to utilize any evidence that would otherwise be suppressed pursuant to the exclusionary rule if that evidence is obtained through an independent, lawful search[.]"), *perm. app. denied* (Tenn. Apr. 12, 2012).

### a.  Search Incident to Arrest

The Defendant argues that the State did not show that USBP agents inevitably would have seized the firearm in a search incident to arrest.  At the hearing on the Defendant's motion to suppress, the trial court found that

> . . . I do believe that search incident to arrest – that was immediately what I thought before I even remembered signing the search warrant.  That there

was a BOLO out. This car was headed for the border. Right there[,] before it was crossed[,] this thing was stopped. There was a reason to arrest him at that time. This search would have taken place whether [Agent Marshall] went out there and looked for the medication or not. This vehicle would have been searched incident to an arrest. So, I think it's – it's with no doubt in my mind that this information – this gun would have been located when the vehicle was searched incident to the arrest of [the Defendant].

In its written order on the motion for a new trial, the trial court held

[t]he stop and resulting arrest was pursuant to a BOLO for the Defendant and the vehicle on an apparent homicide. [The] Defendant was arrested and various items [were] recovered, including a gun. It is reasonable and appropriate for a search incident to arrest to be conducted under the circumstances as they existed.

In *State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009), the Tennessee Supreme Court discussed the exception to a warrant in a search incident to an arrest and the four conditions which must be met for such an exception to apply. First, "the arresting officer must have probable cause to believe that the defendant had engaged or was engaging in illegal activity." *Id*. (citing *State v. Crutcher,* 989 S.W.2d 295, 300 (Tenn. 1999) (holding that a "custodial arrest," which is required to justify a search as incident to arrest, must be "based on probable cause")). Second, "the probable cause must attach to an offense for which a full custodial arrest is permitted—i.e., there must be statutory grounds for a warrantless arrest." *Richards*, 286 S.W.3d at 878. Third, "the arrest must be consummated either prior to or contemporaneously with the search." *Id*. (citing *Crutcher,* 989 S.W.2d at 302 n. 12). Lastly, "the search must be incident to, not the cause of, the arrest." *Richards*, 286 S.W.3d at 878 (citations omitted). In *Arizona v. Gant*, the United States Supreme Court held that

Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Arizona v. Gant*, 556 U.S. 332, 351 (2009).

Here, it is not disputed that the Defendant was in an enclosed detention area when Agent Marshall discovered the weapon, which the evidence established was clearly not

- 21 -

within reaching distance of the vehicle, which had been moved to a secondary location. The State does not put forth any argument on this issue. We agree with the Defendant that the trial court erred in finding that the search incident to an arrest exception applied to the facts of this case.

b. Inventory Search

The Defendant argues that the TBI never conducted a warrantless inventory search because the vehicle was searched pursuant to a search warrant before an independent inventory search occurred. The State argues the firearm would have been inevitably discovered pursuant to the inventory search performed by the TBI Crime Laboratory, even if the search did not qualify as a lawful consent search. At the hearing on the suppression motion, the Defendant argued that the TBI does not always do an inventory search, stating "TBI does sometimes. Sometimes not." The Defendant argued that the "inventory search" was just used "as a way of kind of getting around a consent search." At the conclusion of the hearing on the motion to suppress, the trial court found

> And kind of part and parcel to that is the inventory search. This was a search pursuant to an inventory that was requested by the agent in charge -- Special Agent Anderson. There was a reason to inventory the vehicle. There was a fleeing of the scene. So, I think the inventory search exception also comes into play here. I think it could have come in solely based on inventory search.

In its written order overruling the Defendant's motion for a new trial, the trial court found

> There was a basis to perform an inventory search on the vehicle. In fact, there was a duty to do so to ensure the case was investigated properly. Exculpatory evidence as well as inculpatory evidence could have been recovered. As this homicide occurred in Tennessee and was being investigated by the TBI, transport of the vehicle to its headquarters is reasonable and proper.

As previously stated, a lawful inventory search is another exception to the warrant requirement. *State v. Watkins*, 827 S.W.2d 293, 295 (Tenn. 1992); *State v. Guy*, 679 S.W.3d 632, 683-84 (Tenn. Crim. App. 2023). "Under this exception, it is constitutionally permissible for police officers to inventory the contents of . . . lawfully [seized property] without a search warrant as long as it is in accordance with routine administrative procedures." *Watkins*, 827 S.W.2d at 295. The purposes of an inventory search is "(1) to protect the property of the owner, and (2) to protect officers from claims of negligence or violation of civil rights in the event property disappears or is damaged." *State v. Cabage*, 649 S.W.2d 589, 592 (Tenn. 1983). Considering the purposes of an inventory search,

"officers may properly open unlocked containers . . . when necessary to make a realistic and meaningful inventory." *State v. Glenn*, 649 S.W.2d 584, 589 (Tenn. 1983).

The Defendant argues that because the "inventory search" occurred after the search warrant was issued, none of the purposes of an inventory search supported such a search. The Defendant argues that no inventory search actually occurred, but rather only the execution of the search warrant. The State disagrees, arguing that the issuance of the search warrant does not negate the fact that the TBI would have conducted an inventory search as a matter of routine procedure. As such, the firearm would have been inevitably discovered during an inventory search of the Defendant's vehicle.

Here, TBI Special Agent Anderson testified that the Defendant's vehicle was impounded after it was transported from New Mexico and that he requested that the vehicle's contents be inventoried. This was supported through the form Special Agent Anderson submitted to the Crime Laboratory on August 15, 2021, which was introduced at the suppression hearing. He further testified that an inventory search is a standard procedure when a vehicle is impounded at the TBI Crime Laboratory. Special Agent Manfredi testified that she performed an inventory search of the vehicle. She testified to the process she followed in performing the inventory. Accordingly, we agree with the trial court's findings that even if no valid consent existed, the firearm would have been inevitably discovered during the inventory search, which was TBI standard practice when a vehicle was impounded. The trial court appropriately denied the Defendant's motion to suppress on this basis.

### c. Valid Search Warrant

The Defendant argues that no exception to the warrant requirement authorized the search of his vehicle, thus making the seizure of the firearm unlawful; accordingly, the Defendant argues that the search warrant is invalid without reference to the firearm seized in New Mexico. The State responds that even assuming the firearm was unlawfully discovered, the search warrant was valid without reference to the firearm. At the hearing on the motion to suppress, the trial court found

> And, then, further I think – again, this is similar. The inevitable discovery, I think based on the facts here of what we have, how this thing was located, the search warrant that was signed, I think that that was sufficient.
>
> I've reread the affidavit of the search warrant and I've – I conclude without – really without a shadow of a doubt, . . . that if I redacted the portion of the affidavit that references the gun, I still would have found probable cause exists to issue this search warrant based on the blood on the clothing, the fact

that he had not been seen or heard since the body had been found, where he was located down there in New Mexico. I would have most assuredly signed it whether there – the gun was referenced or not.

In its written order overruling the Defendant's motion for a new trial, the trial court similarly found that the "search warrant affidavit was sufficient even when elided" to omit reference to the firearm.

The Fourth Amendment of the United States Constitution and Article 1, section 7 of the Tennessee Constitution state that search warrants shall issue only upon probable cause. *See* U.S. Const. amend. IV; Tenn. Const. Art. 1, § 7. A prerequisite to the issuance of a search warrant is "[a] sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists." *State v. Saine*, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). "[T]he affidavit must contain more than mere conclusory allegations by the affiant," *Henning*, 975 S.W.2d at 294; the facts contained in the affidavit must be sufficient that "the neutral and detached magistrate may determine, upon examining the affidavit in a commonsense and practical manner, whether probable cause exists," *State v. Tuttle*, 515 S.W.3d 282, 300 (Tenn. 2017) (citing *State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006); *Henning*, 975 S.W.2d at 294).

The Tennessee Supreme Court has held, "an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry." *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992) (citing *Segura v. United States*, 468 U.S. 796, 813–14 (1984)). If an affidavit for a search warrant contains sufficient probable cause after all offending information has been redacted, evidence discovered during the execution of the search warrant would not be subject to suppression pursuant to the independent source doctrine. *See State v. Smith*, No. W2009-02678-CCA-R3-CD, 2011 WL 6885348, *7 (Tenn. Crim. App. April 12, 2012).

Here, the trial court found that even if the reference to the .22 Beretta was redacted from the affidavit in support of the search warrant, the remaining information contained in the affidavit would independently support probable cause for the issuance of the search warrant. The affidavit referred to the victim and the four dogs having been shot to death and the presence of both human and canine blood at the scene of the deaths. It also referred to the Defendant's flight. The affidavit also referenced the brownish stains on the Defendant's clothing when he was stopped while driving the victim's missing vehicle in Las Cruces. The warrant specifically stated that law enforcement was seeking to locate any human or canine bloodstains. As noted above, the search of the Defendant's vehicle

was a valid warrantless search pursuant to the consent exception to the warrant requirement. Regardless, the information contained within the search warrant, even without reference to the firearm, was sufficient to establish probable cause, and the trial court appropriately denied the Defendant's motion to suppress on this basis. The Defendant is not entitled to relief.

## C. Sufficiency

The Defendant argues that the evidence was insufficient to support his conviction of premeditated first degree murder because the State failed to prove premeditation. He argues that the absence of proof of events immediately preceding and leading up to the killing fails to sufficiently prove the killing was committed "after the exercise of reflection and judgment." Thus, he argues the conviction offense should be reduced to second degree murder. The State responds that the Defendant is not entitled to relief because the evidence of premeditation is sufficient to support his conviction. We agree with the State.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also Thomas*, 687 S.W.3d at 249 (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

First degree murder is statutorily defined as a "premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1)(2018). A premeditated act "is an act done after the exercise of reflection and judgment." *Id*. 39-13-202(e) (Supp. 2021). Further,

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. As relevant here, a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim. Tenn. Code Ann. § 39-11-302. "The existence of premeditation is a question of fact to be determined by considering all of the evidence." *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (first citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); and then citing *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013)). "Because premeditation involves the defendant's state of mind, of which there is often no direct evidence," premeditation may be sufficiently proven through circumstantial evidence, and a jury may reasonably infer premeditation from the manner and circumstances of the killing. *Reynolds*, 635 S.W.3d at 916 (first citing *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003); and then citing *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009)).

The Tennessee Supreme Court has discussed the types of evidence which may be indicative of premeditation as follows:

(1) The use of a deadly weapon on an unarmed victim;
(2) The particular cruelty of the killing;
(3) Threats or declarations of intent to kill;
(4) The procurement of a weapon;
(5) Any preparations to conceal the crime undertaken before the crime was committed;
(6) The destruction or secretion of evidence of the killing;
(7) Calmness after the killing;
(8) Evidence of motive;
(9) The use of multiple weapons in succession;
(10) The infliction of multiple wounds or repeated blows;
(11) Evidence that the victim was retreating or attempting to escape when killed;
(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (internal citations omitted). This list is not exhaustive, and because the trier of fact "is not limited to any specific evidence" in determining premeditation, "premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgment." *Id.* at 917 (first citing *Davidson*, 121 S.W.3d at 615; and then citing *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004)) (internal quotation marks omitted).

On appeal, the Defendant does not dispute that the evidence establishes that he shot the victim; he merely challenges the sufficiency of the evidence of premeditation. The evidence, viewed in the light most favorable to the State, showed that the victim was shot twice in the head by the Defendant, while she slept or rested lying on her side in a recliner, facing away from the entrance to the room. There was no evidence of a struggle or that the victim was armed. She was clothed only in her panties and covered only by a sheet. Both shots were fatal. One of the shots was fired from close range while the other was fired from an intermediate range. The position of the victim's body is circumstantial evidence that the victim posed no threat to the Defendant at the time of her death. There was no evidence that the Defendant attempted to render any aid to the victim. The Defendant also shot and killed the victim's four dogs, which she considered her "babies" or children. The Defendant then fled to New Mexico driving the victim's vehicle. When the victim was stopped at a border checkpoint based upon a BOLO, the murder weapon was discovered hidden in a cooler-type container within the vehicle. This evidence is sufficient to establish premeditation. The Defendant is not entitled to relief.

D.  CLERICAL ERROR

Although not raised as an issue by the parties, we note, upon our review of the record, that the Defendant's judgment of conviction in count one identifies him as a Range I, standard offender, eligible for release after serving thirty percent of his sentence. The Defendant was convicted of first degree murder, for which he received a sentence of life imprisonment. Defendants convicted of first degree murder who receive a sentence of life imprisonment must serve one hundred percent of their sentence, less any sentence reduction credits up to fifteen percent. *See* Tenn. Code Ann. § 40-35-501(h)(2) (2021 Supp.) (subsequently amended). Accordingly, we remand this case for the entry of a corrected judgment in count one indicating that the Defendant is required to serve one hundred percent of his sentence. *See* Tenn. R. Crim. P. 36.

III.    CONCLUSION

Following our review of the record and based on the foregoing analysis, we remand for the entry of a corrected judgment in Count One consistent with this opinion. We otherwise affirm the judgments of the trial court.


s/ *Steven W. Sword*
STEVEN W. SWORD, JUDGE